# Case No. 15,597.

## UNITED STATES v. LIBBY.

[1 Woodb. & M. 221.][1]

Circuit Court, D. Maine.   May Term, 1846.

SLAVE TRADE—ILLEGAL ACTS—AFRICAN TRADE—MANUMITTED SLAVES—CRIMINAL INTENT.

1. If a vessel sail from the United States, owned by a citizen and under instructions to correspondents in Rio, to sell her within a limited price or charter her, the commencement of her voyage is legal or its face. If the consignees charter her to a Brazilian for one year, at the ordinary rate of freight, and not to be employed in carrying merchandise or passengers, which are unlawful, the charter on its face is legal. If under it, goods are put on board, consisting of rum, cotton goods, brass rings, gunpowder, &c., suitable for sale or exchange in Africa for slaves, and these articles with their owner, are carried to the eastern coast thereof, and landed at slave factories, this standing alone is not prohibited by any act of congress.

2. But this and other acts of the captain, such as seeing the purchase of slaves there by the owner of the goods, the shipment of them to Brazil in other vessels, and the bringing him and other free persons hither, who had an interest in the slave trade, are evidence, from which it is competent for the jury to infer, unless satisfactorily rebutted, that the master was himself intentionally coöperating and interested in the slave trade, and taking a part in its gains and criminality.

[1] [Reported by Charles L. Woodbury, Esq., and George Minot, Esq.]

3. But he would not be liable for a capital offence, committed on board his own vessel, unless he did so coöperate, and decoy, force or receive some African on board there, with intent to make him a slave.

4. If one came on board there with other blacks, the crew of the pilot, and staid. but a few hours, and the captain was busily engaged, and did not know him to be a slave, on his way to be sent in another vessel to Brazil. it was not such a receiving of him as the law contemplates.

5. So if he received two other Africans on board there, and brought them to Brazil, without actually supposing them to be free, he would be guilty, either of a misdemeanor or capital offence, as he was merely carrying them for others, or was aiding and acting with others as a participator in the design to make men slaves longer, who were before in bondage, or to reduce those to slavery, who were before free.

6. It was adjudged to be competent evidence against him as to his intent on these points, that his vessel was chartered by persons who turned out to be slave-dealers; remained a year or more in their company and employment in carrying merchandise and free passengers; knew their business in Africa; and returned to Brazil in their company.

7. So, on the other hand, it was ruled to be competent for him to show, that he took no persons on board his vessel, knowing them to be slaves; that he neither bought, nor sold, nor kidnapped any; that the two blacks, whom he knowingly received on board and brought to Brazil, had free papers, as if manumitted, and that he believed them not to be slaves.

[Cited in Emma Silver Min. Co. v. Park, Case No. 4,467.]

8. It was adjudged to be evidence of the genuineness of their manumission papers, that they were attested and sealed by persons, purporting to be Portuguese notaries public on that coast, and who had acted as such in other business; that they were on the kind of paper and under the stamp used there in the public offices, were lodged with the proper authorities in Brazil, and the Portuguese consul there certified to the notaries being regular officers of his government, and that the American consul at Rio obtained and sent to this country all these papers with translations.

[Cited in Wood v. St. Paul City Ry. Co., 42 Minn. 413, 44 N. W. 308.]

9. It was ruled. that they must be presumed to have been executed at their date, if no evidence appeared to the contrary; and, though this and the other matter just referred to, might fail to satisfy the jury, that the papers were in truth genuine, yet if they believed the master supposed them to be genuine, and took the two Africans who had them, on board, supposing them to be in truth free, he was not liable to punishment.

10. To show the intent of the master, any acts by him on the voyage, and so near the time of the offence charged in the indictment as to be connected with it and bear on it, were admitted on the part of the United States; but not what was done in a previous voyage on the western coast of Africa.

11. A passenger is not one of the crew or ship's company, within the meaning of the act of congress.

12. If a principal in a transaction be not liable under our laws, another cannot be charged merely for aiding and abetting him, unless the other do acts himself, which render himself liable as a principal.

13. Intents and acts, tending to make some one a slave, are both necessary under the act

of congress of 1820, c. 113 [3 Stat. 600], to convict a person of a capital offence; though under other laws of congress a person may be guilty of a misdemeanor for merely transporting slaves from one place to another abroad.

14. Nothing can be punished under the laws of the United States, which they do not make criminal: and the transportation of any kind of goods to Africa by the owner or a carrier, is not yet made a crime by any act of congress, independent of the intent with which it is done.

[Cited in U. S. v. Plumer, Case No. 16,056.]

15. The constitution and laws have contemplated that slavery is to be safely abolished in this country, by cutting off additions to it of ignorance and paganism from abroad, and elevating its victims, so as in time to be usefully returned to Africa, or made fit for emancipation here. And it is to be abolished in Africa, not only by refraining to purchase slaves there, but by civilizing her people, so as not to make prisoners of war slaves, and producing, by industry and arts, other articles with which to buy foreign merchandise.

[Cited in The Passenger Cases, 7 How. (48 U. S.) 544.]

This was an indictment against the defendant [Cyrus Libby], belonging to Scarborough, in this state, as master of the brig Porpoise, a vessel owned by citizens of the United States. He was charged with having received on board said brig on the 8th of December, 1846, within flow of the tide, at a place called Lorenzo-Marquez, on the eastern coast of Africa, a negro called Luez, not held to service by the laws of the United States or either of them, and with an intent to make him a slave. The defendant was arraigned on this indictment at an adjourned session of the court in August, 1845, when the indictment was found, and pleaded thereto not guilty. The trial came on, July 7, 1846, and after a full hearing was committed to the jury on the 16th of that month, under the following rulings, and also the following charge of the court on the various questions of law arising in the cause.

Most of the facts will be stated in the opinions of the court, that are necessary to understand the grounds of the law upon them. It is sufficient to say here, that the Porpoise was proved to belong to G. Richardson, of Gorham, Maine, and to have sailed from Portland in 1842, on a freighting voyage, under the command of Libby, both being American citizens. He was instructed when reaching Rio Janeiro, as he did in January, 1843, to report to Wright, Maxwell & Co., as consignees, with authority in them to let her for freight, or sell her at a limited price named in the instructions. On the 14th of January, 1843, they entered into a charter party for her with one Franceco, a Brazilian, for one year, and as much longer as was necessary to complete any voyage then begun, at the rate of 900 milreas (about $460) per month, and to carry no persons not free, and no goods illegal in character. She sailed thence for the eastern coast of Africa the next month, with certain merchandise and free passengers on board, as hereafter described, and while on the coast of Africa

and on her return was employed in the manner which will be stated in the opinion of the court. On her return she was informed against by Johnson, a free colored man on board, who had been severely punished in Africa for taking a boat ashore without leave, and after examination at Rio before the American minister, consul, and the commander of the American squadron, was sent home by the latter for a breach of the laws of the United States against the slave trade.

Mr. Haines, U. S. Dist. Atty.

Fessenden &. Deblois, for the prisoner.

WOODBURY, Circuit Justice, made the following rulings, and gave the following opinions in the progress of the case:

In the course of the trial the counsel for the government offered evidence in order to show Libby's knowledge and intents in this voyage, that while on the eastern coast of Africa he had received on board the Porpoise, not only the boy called Luez, and the sole one named in the indictment, but another boy by the name of Pedro, who was a slave and a brother of Luez, and at another port another boy by the name of Guilheme. And the government proposed to prove, also, some facts which took place on a prior voyage of the defendant in the Porpoise, on the western coast of Africa, under the same general charter party, and urged the admission of all this for the purpose of showing the knowledge of Libby of the illegal objects of the hirers of the vessel, and of the slave character of the black Luez, when he was taken on board.

THE COURT ruled that any thing done by Libby, or those who chartered the vessel during the voyage, and near the time when Luez was taken on board, might be shown in order to prove his knowledge and intents, but nothing of a separate and independent character, transacted at a different place and on a different voyage, and so distant in time as not to bear on this transaction, nor he be likely to come prepared to meet or rebut it on this trial. See People v. Hopson, 1 Denio, 574.

On the same principle, it was ruled that questions could not be asked as to what afterwards became of some of the slaves put on board a vessel called the Kentucky, that sailed to Brazil from that part of the African coast, while Libby was there, unless the government proved first some connection in interest and business between the Kentucky and Libby, or between those slaves and the receiving Luez on board the Porpoise, which is the only charge in the present indictment.

The letters of G. Richardson, the owner, as well as of his consignees, written to Libby before Luez was on board, and giving instructions as to the object and character of the voyage, though objected to by the government as not being competent evidence, were admitted as a part of the res gestæ to

show the design with which the vessel was sent from this country and chartered, and if believed to be written honestly and not as a cover or artifice to conceal illegal objects, the jury were instructed they should tend to rebut any improper views in the outset in this voyage of the Porpoise. But if designed to conceal illegal objects, they were an aggravation of the offence. So letters of freedom or acknowledgments of manumission, to Pedro, at Lorenzo de Marks, and to Guilheme, at Inhambane, made before persons styling themselves to be notaries public of the Portuguese government with their seals annexed, were also allowed to go to the jury, though objected to by the counsel for the United States (Peake, Ev. 73; 9 Mod. 66; [Nicholls v. Webb] 8 Wheat. [21 U. S.] 333; Story, Bills, § 276; [Ventress v. Smith] 10 Pet. [35 U. S.] 170; 1 Greenl. Ev. §§ 4, 5; 1 Denio, 376), and permission was given Libby to offer any evidence in his power as to their being genuine, and as to his having possession of them, believing them to be genuine when these boys were received on board.

THE COURT said it should instruct the jury that, being under the signatures and notarial seals of persons purporting to be notaries public, they might be considered prima facie genuine, without any collateral proof. Notarial seals need not be proved, but must be judicially taken notice of. 1 Greenl. Ev. § 5; 12 Mod. 345; 2 Esp. 700; [Yeaton v. Fry] 5 Cranch [9 U. S.] 335; 6 Serg. & R. 484; 3 Wend. 173; Bayley, Bills, 515. They are also to be presumed to have been executed at the time of their date (1 Best, Pres. 116), which was before the boys came on board.

THE COURT allowed in evidence, to corroborate them and strengthen the probability that they were executed before Libby left the coast, the facts that the paper had the royal water-marks on it, such as is used by the Portuguese public officers there; that it had also the stamps for duties which are affixed there; that it was like other paper in appearance and texture and marks, which is used there for public purposes; that the name of one of the notaries is the name of a person known to have acted as a Portuguese notary public there on other occasions; that the seal, annexed to a passport, connected with one of the documents, is the seal used by the officers of the Portuguese government there; that these papers were lodged with the regular authorities at Rio, when the Porpoise arrived there, and were forwarded here with a certificate on each, by a person purporting to be a Portuguese consul, stating that the notaries, signing and sealing, were legal officers of Portugal on the eastern coast of Africa, and were accompanied with translations of all into English, and were so forwarded under the signature of the American consul at Rio, as having been applied for by Libby, the prisoner.

These facts and circumstances were all permitted to go to the jury for their consideration, but under instructions given upon them in the charge, that the papers purporting to be manumissions, should have no weight, unless in the end they believed, from all the testimony, that the accused had them in his possession, or had seen and believed them to be genuine when he took Pedro and Guilheme on board. And if he so had them, or so saw and believed, that was sufficient, whether the due execution of the papers was technically proved or not. For, if so believing, he of course did not intend to make them slaves, by so receiving and carrying them, since he carried them as free persons, and for aught which appears they still remain free. (Both of them were then in court, nobody claiming them as slaves since they came on board.)

After the evidence was closed, and the counsel on both sides had submitted their views to the jury, the opinion of THE COURT on the general principles of law arising in the case were stated, with extended references to the testimony.

The law as laid down, on the main points, was as follows:

The first question, made as to the voyage by the counsel for the government, is, that it was illegal on the face of it, to carry such merchandise on freight from Rio to Africa, as was taken by the Porpoise. But the jury were instructed, that, for aught which had been proved, the voyage of the Porpoise, as planned by the owner, J. Richardson, was an ordinary one, and, on its face, not in violation of any act of congress. It was under consignment to Wright, Maxwell & Co., for usual employment in carrying freight, or for sale at a limited price.

Next, they were instructed, that the charter party, entered into by the consignees with Franceco for one year for nine hundred milreas, or about $450 per month, to carry any lawful merchandise or free passengers, was, on its face, not a voyage prohibited by any law whatever. Yet all these might be colorable and false.

It was then a further and very important inquiry, whether anything occurred afterwards and in connection with the voyage, which should alter the legality of it, or the appearance of its legality. For, however lawful in part a voyage might be in its inception or external features and purports, circumstances might be developed, and misconduct occur afterwards, which would indicate it to be entirely unjustifiable. The Porpoise in this case, after such instructions and such a charter party, sailed from Rio in February, 1844, for the eastern coast of Africa, with several passengers on board, who were Brazilians, and some of them agents of Franceco, with a cargo consisting of rum, cotton goods, iron bars, gun-powder, brass rings, &c., being articles such as are in demand on that coast, and such as usual-

ly are sold for money, and slaves purchased sometimes with the proceeds, or such as are often exchanged for slaves. The cargo was landed there at different factories, under the direction of Paulo and others, and a launch, which belonged to him. The Porpoise arrived there in April, 1844, and remaining on the coast till December, 1844, landing the cargo at the places described, tended to show Libby's knowledge of their business, and for the same purpose he was proved also to have gone on shore occasionally during the time to get provisions at the factories; sometimes dined there by invitation with Paulo; saw slaves in their yards, and some of the witnesses swear he was present at times with themselves, when some were bought and branded by Paulo.

It was further shown, that he sailed in company from Lorenzo de Marks to Inhambane, with a vessel called the Kentucky, and under the control of Franceco and Paulo, and took on board there some of her crew, who were Americans, as passengers, before the Kentucky loaded with slaves under a Brazilian captain and crew, and sailed with them as she did to Brazil; that the Porpoise and Kentucky hung out lights in the night for each other in going from Lorenzo de Marks to Inhambane, a voyage of sixty or seventy hours; that Libby took on board there one African boy, before named, called Guilheme, and another on his return at Lorenzo de Marks, called Pedro, but both supposed to have the manumission papers before described, and carried no other Africans, unless he knowingly received Luez, as charged in the indictment, and carried him about fifteen miles to Inaak, where he was landed with Paulo and the pilot's crew; that after Libby's return from Inhambane, he waited by direction of those chartering the Porpoise, till a slave vessel, the Galafelia, was loaded and sailed the same day he did for Rio—but he with no cargo on board the Porpoise, and merely provisions and water and some free passengers and the two boys, Guilheme and Pedro. Various other incidents and expressions used by Libby were given in evidence, to prove his knowledge of the business in which Franceco and Paulo were engaged, and in rebuttal showing his disproval of it; and especially, the evidence before referred to, in the rulings of the court as to the manumission of Guilherme and Pedro, before he took them on board.

On all of these, THE COURT instructed the jury that the conduct of Libby, on the whole voyage, must be considered legal or illegal, according to the real intentions with which he entered upon it, and conducted till its close,—accompanied by such acts as congress has made penal. The law requires, to constitute a capital crime, both intentions to make persons slaves, and such acts as either kidnapping them, or receiving them on board a vessel, with such views. For intents without acts, or acts without intents, are insufficient. Where an act is a crime and capitally punished, courts and juries must require very decisive participation in the principal offence by a guilty intent—more than is necessary to avoid a contract, to recover for what is done or furnished in such a case; though even there it must be clear. There they must aid and participate in the principal design, or in the illegal acts themselves. See 8 N. H. 550, and cases there cited. Without any explanations as to such a voyage, and with such companions, and such a cargo, as Libby sailed with from Rio to the suspicious coast of Africa, and returning in such polluted company to Rio, it might be entirely justifiable to infer that he was a copartner in the slave trade itself with Paulo and Franceco, participating in the slave trade itself, by receiving Luez on board, profiting by its gains, blackened by its guilt, intending to assist in the confinement of its victims, and coöperating designedly in depriving them of liberty, or in perpetuating such a wretched condition by transporting them in bondage to a foreign country. And if the jury believed this to be his position, after all the evidence and explanation on his part, then it was competent and proper, however painful, to find him guilty of the capital offence charged in this indictment. It would make him a principal in the trade, and the jury need not trouble themselves about the circumstance that some sections of the act of congress, like that now under consideration, did not, eo nomine, punish aiding and abetting while others did. Libby's conduct in such case would not be like that of one merely an aider, an accessory before or after the fact —or an abettor in it, but would be that of an active participator—one of the principals— and equally guilty and equally punishable with other principals.

Had he been charged in this indictment as aiding or abetting Paulo in conveying slaves on board the Kentucky or Galafelia, or as doing it on board them, as one of the principals, rather than on board the Porpoise, he could not be convicted on such evidence. Because, in these vessels he was not one of the "crew or ship's company," as the offender must be of the vessel on board which the slave is received, and because a Brazilian, doing these acts on board a Brazilian vessel, is not committing a capital offence by our laws, and probably is not by those of Brazil. Nor if Paulo did the act on board the Porpoise, could Libby be convicted of aiding in it like an accessory, unless he knew and participated in Paulo's designs. Even then, some doubts should exist, as Paulo himself, not being one of her "crew or ship's company," is not punishable for it under the act of congress as a principal. For a mere passenger, from the laws of Oleron down to the present day, is not considered one of the "crew or ship's company,"

the latter being the mariners, and having a voice, in times of peril. in consultations, and being under obligations to service, and exposure, and obedience. When a principal cannot be punished for an act under any law, it would be difficult to hold guilty one who was merely an accessory or abettor. As if a parent or master punishing a child, or scholar, or apprentice, or seaman, under certain circumstances was justifiable, but one aiding him to do it was guilty of a crime.

In short, gentlemen, consider it the law for this trial, that if Libby himself was a co-owner in the slaves—if he embarked in the profits and loss of the slaver's voyage—if he had power and control over the slave cargoes—if he united in the kidnapping or confining—the purchase or the sale of them—if he did any thing which is a constituent part of the principal offence (U. S. v. Wilson [Case No. 16,730]), he was a principal with the others in both heart and deed; and as such, he can and ought to be punished capitally under the act of congress, for receiving any of them on board of the Porpoise. But on the contrary, he and his counsel deny all this, and they offer much evidence, and refer to numerous circumstances to rebut it. The jury will examine them with care, as it is a case of life and death; and if reasonable doubts as to guilt remain after examining them, he is entitled to an acquittal under this indictment, however he may be guilty of a different and less crime for carrying slaves for others as a mere carrier, and be liable to conviction under the other indictments now pending against him for such last offence.

Some of the facts relied on by the prisoner are these: From the charter party itself, it is insisted to be clear, that Libby had no idea of entering into the transportation or purchase and sale of slaves—that however he may have seen and known the slave dealing of his employers, he conducted throughout in accordance with the contract; adhering to it in substance, and not using it as a cover; going with the intent to take no slaves on board, no persons whom he supposed to be slaves; buying none; selling none; allowing none to touch his vessel or boats, but only those he believed to be manumitted, like Pedro and Guilheme, or to be the crews of the African pilot, like Luez, and which crew it was necessary to have temporarily on board, and to carry whom, while piloting the vessel, was, of course, not within the spirit or letter of the act of congress. It was further insisted, that his birth, education and principles, all preclude the idea he should attempt to violate so important a law of his country. That he had no motive for it, in receiving any increased wages, no indemnity, no security, nor had his owners any object, to expose their vessel to forfeiture, or he or his crew any inducement to risk their lives and property, as well as character, in such an illegal enterprise, the freight to be paid monthly by the charter, being proved to be only an ordinary rate.

On all the facts, appealed to in support of this view, connected with those urged by the government to sustain a different view, it was for the jury and not the court to decide, what were Libby's real objects; and, if they believed he received Luez on board knowingly, and supposed him to be a slave, and with intent to make or continue him a slave, they should convict; but if otherwise, acquit of the capital offence.

There are four leading propositions which embody what is considered the law on this subject:

1. Whoever, being an American citizen, receives negroes on board a vessel on the coast of Africa, with an intent to continue them in bondage, being interested in them, and in the trade is liable to be punished as for a capital offence.

2. Whoever, being such a citizen, carries only merchandise in his vessel, but coöperating with others, who carry slaves in different vessels of the United States, with the intent to make them slaves, and is transporting the merchandise as a participater in the slave trade and its gains, is exposed to a like capital punishment.

3. Whoever is not interested in the slaves, and has not kidnapped or taken them on board his vessel with intent to make them slaves, but merely carries them from one foreign port to another for others, and for ordinary hire, he is guilty of a misdemeanor under acts of congress, which punish such conduct with heavy fine and imprisonment; but is not doing what is punished by those acts with death and the ignominy of piracy.

4. If such person be neither interested in the slaves themselves, nor engaged, personally, in making others slaves, nor employed in carrying them, knowing them to be slaves, but transports merchandise merely, and that as a carrier of goods for others, to earn freight, rather than coöperate in making or paying for slaves, it is not declared to be an offence of any kind by any of the existing acts of congress.

THE COURT as before remarked, do not consider this one of those cases, where a certain act is made penal, without reference to intent. Because the act of congress itself makes the intent the great essence of the offence, as it is in most cases of crimes. Without the malus animus—the evil mind—the guilt to be punished cannot, in a case like this, exist. It is true, that the legislative power may be broad enough to declare certain acts to be illegal and to punish them, without saying any thing about motives.

But no act of congress has, in terms, made such a charter party as that of the Porpoise, unlawful on its face, though made to slavers and to carry their goods. Nor has any act prohibited the freight to the coast of Africa, whether as an owner, or carrier for others, of rum, or gunpowder, or colored cot-

tons, or brass rings, independent of any design to use them by the carrier himself in the slave trade, or to engage with them himself in its traffic. If we then, without any express law, were to hold, that such a voyage or freight was on its face illegal, we should make the law, rather than expound one already made. It may seem a little singular to this generation, but before 1794, it was not punished as illegal for citizens of the United States to engage even in the slave trade itself, whether foreign or domestic. We had, to be sure, while colonies, been obliged to submit to the importation of slaves by the parent country, though under earnest remonstrances of our fathers against it. We had felt its horrors in our own persons, our sons and daughters taken captives by the savages and held as slaves, and at times so sold in the Montreal market, and again and again redeemed, as was Stark, himself, the subsequent hero of Bennington, by an agent of New Hampshire. We have since seen it worse than repeated as to our gallant seamen by some of the barbarians of Africa, by the semi savages of Algiers and Tripoli, till we became powerful enough to avenge our wrongs and prevent a renewal of them. In short, the whole Union, even before the adoption of the constitution, had gradually become convinced that the only mode effectually to extirpate what the Northern states considered the curse of slavery, was at an early day to stop the addition to the number here from abroad; not only thus cutting off a large and constant reinforcement, but putting an end to the introduction of new ignorance, new superstitions, new Paganism, and allowing the arts of civilization and Christianity gradually to elevate and make more safe the liberation of slaves, long remaining here; and by returning them more civilized, to enlighten and reform slavery at home in Africa; or by releasing them here, when fit subjects for emancipation, thus, in time, to terminate the evil throughout and forever.

Seeing and feeling all this, and that slavery itself might thus in time safely cease, the prudent framers of the constitution secured a right in it to prohibit the slave trade into the United States after 1808, with an implied power to prohibit it at once from being carried on abroad by American citizens, and left slavery itself to be abolished here entirely, and as fast as each state should find it expedient and secure to itself. It is from this apparent, that the foreign slave trade with this country was left to each state to legislate for itself till 1808.) Accordingly, most of the states after the Revolution, even at the South, acted promptly for themselves, and prohibited the importation of slaves into their own limits from abroad. But nothing was done by congress under the constitution in respect to the slave trade, till an act, in 1794 [1 Stat. 347], made it penal for Americans to engage in it abroad. No court or jury of the United States could, before that, have in-

flicted penalties on persons engaged in that trade; nor could they then, by that act, have inflicted them on those engaged in the slave trade to the United States. Only the judges and juries of each state could enforce their own laws against this trade. It is more emphatically the rule under a government of specified powers, such as the constitution of the general government, that its officers cannot regard and punish, as offences, any thing not forbidden by the constitution, or by acts of congress.

The further history of the legislation of the general government on this subject is very instructive on this point, as also on the peculiar character and proper construction of the particular law the prisoner is now tried for violating, as distinguished from other laws of a kindred, but less severe character. Adverting to it, then, for a few minutes; congress having made, by that first act, the fitting out of a vessel here for the foreign slave trade, punishable by a forfeiture of the vessel, and $2,000 fine, proceeded next, in 1800, six years after, and made any citizen of the United States, engaged in that trade, liable to double the amount of his interest therein, and, furthermore, they punished with a fine of $2,000, and imprisonment for not over two years, the serving in any such vessel by a citizen of the United States. Next, in February, 1803 [2 Stat. 205], congress, in aid of those states which had voluntarily prohibited the slave trade into their boundaries from abroad, made it penal to import slaves into them, and forfeited the vessel in addition to imposing a fine for each negro thus introduced. Again, on March 2, 1807 [Id. 426], congress, in its eagerness to exercise the constitutional right to prohibit the slave trade to this country at all after the commencement of 1808, passed a law in advance, expressly forbidding any such importations, under the penalty of forfeiting the vessel, and paying a fine of $20,000, and imposing a further fine of $5,000 on any person aiding or abetting therein, and subjecting those interested in the slaves themselves to imprisonment as well as fine. After this, it was not till the treaty of Ghent stipulated for further measures towards the abolition of the trade, that in 1818 [3 Stat. 450], an act was passed forfeiting any vessel of the United States engaged in that trade, to or from any place whatsoever, and, furthermore, imposed a fine from one to five thousand dollars, and imprisonment from three to five years. It punished, in like manner, the transportation from any place abroad of a negro or mulatto not held to service by any of our own laws. And made some other modifications of former acts on this subject.

But, not content with this moderation for the worst cases, and seeing that there were different degrees of turpitude in the mere carrying of slaves, and being engaged on the African coast or any foreign shore in the

kidnapping of them, or securing them on board, or in decoying or forcing them on board in any way to make them slaves, congress, in A. D. 1820, passed an act declaring the latter offence a piracy, and punishable with death. This is the act, and not that of 1818, or any prior or milder one, under which the prisoner is now on trial for his life. But to hold under this last law, that the mere carrying of cottons or rum to the coast of Africa, without regard to intent, and without meaning to make men slaves, by seizing or carrying them away, is a capital offence, when congress has not said so, would be a great stretch of judicial legislation. Congress has not done all things on this subject, because it has done some. This has been shown fully in the history of its legislation, just sketched to you. So if one state, for instance, prohibits selling spirits without a license, another does not. But the judges by construction cannot punish such sale in the latter state, unless it is prohibited there also. So of the keeping of gunpowder in large quantities in cities. So of carrying deadly weapons. They are punishable only by the courts of a state where they are prohibited, and not by the United States courts, unless expressly made penal by some act of congress or the constitution. If we were to pronounce the carrying such goods as the Porpoise freighted illegal, and a capital offence, without reference to the intent not to be engaged in making negroes slaves, or even carrying them on board, where should we stop?

The whole trade to Africa by such a system of construction might be abolished as illegal, and this too by the judicial tribunals alone. That whole trade is all more or less in articles suitable to be exchanged for slaves, or sold there, and the money invested in slaves. The owners of the cargoes know this, who carry for themselves, as well as the owners of vessels who carry such articles for others. The whole coast, from the Isthmus of Suez to Algiers and Morocco, and the mouth of the Niger, doubling the Cape of Good Hope to Cape Inaak, to Mozambique, Zanzibar, and the Red Sea, the whole is black with slavery, and has been probably since the days of Joseph, sold to the Ishmaelites to be a slave in Egypt. And the great export of Africa now, not the only, but paramount one, is slaves; as much as silver is from Mexico, and coffee from Cuba. Slaves are the chief means of payment from the interior for their wants in foreign merchandise, and are universally made, used, and sold. The pacha of Egypt, one of the most enlightened rulers in Africa, though professing to abolish the slave trade, is believed by travellers to go even beyond this, and to make annual incursions over his Ethiopian borders to fill his armies and household with captive slaves. And till education and Christianity elevate the African mind, elevate their governments above the savage practice of making captives in wars slaves, rather than mere prisoners, to be exchanged,—for this is the great seat and source of the evil, and has been in all ages,—I say, till these great principles, with recolonization and advances in industry and the arts, lead the African people to mitigate the horrors of war as to prisoners, as has been their influence in modern Europe, since our proud British ancestors were sold into bondage in the slave markets of Rome, and induce them to produce articles enough, independent of slaves, to exchange or sell to supply their wants in foreign merchandise, nothing but the extirpation of the foreign slave trade can be at all effective in lessening the evils of slavery in that wretched quarter of the globe.

In regard to the American efforts to break up the foreign slave trade, and to take away the demand and the market, whether by fleets on the coast, or penal severities inflicted here, the courts of the United States can go, and are disposed to go, as far and fast as the laws permit. But they cannot go farther without exercising judicial legislation, without usurpation, and infidelity to their oaths. We are mere agents of the law, to execute, and not enlarge or add to them. If they reach only to punish carrying slaves, we cannot extend them to punish carrying merchandise. Whenever congress may choose to go further, and punish as illegal the transportation of any merchandise to Africa, whether by its owners or for owners, and those owners mere merchants or slave dealers, if that merchandise be such as is usually exchanged for slaves, then such a voyage can be treated as illegal, but not till then, unless undertaken with the intent to participate in that trade, and accompanied before its close, by acts of seizing or receiving on board slaves, knowing them to be such. So if congress should please to go further still, and can do it constitutionally, and pronounce it illegal to carry articles to any slaveholding country, Brazil or elsewhere, suitable to be used by slaves, and to thus help sustain the institution or condition of slavery, whether shoes, ploughs, or clothes, of domestic or foreign manufacture, or make it penal to bring hither, or consume the productions of slave labor, whether cotton, or sugar, or tobacco, the courts of the United States can then, but not till then, punish such acts. These acts are, in the views of some, sinful, and should be denounced as illegal. And England has, of late years, actually imposed a higher and discriminating duty against slave grown sugar, though allowing it to be imported and used. But recently she has abolished that discrimination, seeing, that if it was immoral or inexpedient to consume sugar unless under a higher duty, it was immoral, if not inexpedient, to consume it at all, on account of its vicious origin, and not probably being yet prepared, with some, to hold the

use of all articles produced by slave labor as a culpable participation in its guilt. But let the United States government prohibit the consumption or purchase or sale of articles produced by slave labor, black or white, or the sale of any thing likely to be used in the slave trade, it will then behoove courts and juries to enforce such prohibitions, if they can do it constitutionally. But, till then, we possess no authority, acting on common law principles, or any subtle distinctions in the metaphysics of moral science, to set up our private opinions and attempt to enforce them without any legislative warrant from congress.

A single illustration more on these distinctions, and I have done with them. It is drawn from a practice common elsewhere, but which, it may well be a cause of gratitude, is less known among ourselves. Two duellists proceed to the field of honor with their weapons and seconds. The seconds aid and abet, by arranging the terms of the fight, by loading the pistols, and giving orders to fire, and hence are punishable like the principals. But who ever heard that the coachman or hack driver, or conductor of the railroad cars, who aided to carry them or their pistols and balls, were ever indicted as principals or punished as such? The carriers may have known the intention of the parties to fight, but they had no object beyond their own fare, or common wages, in their customary business of carrying persons and things for hire. If this was merely the design of Libby, and nothing more, it is clear that he cannot be punished for a capital offence. Something has been said of former decisions bearing on this question, as more or less stringent. The principle involved in U. S. v. Battiste [Case No. 14,545], decided by my eminent predecessor, was the same as that adopted here. The facts there differed from this, as to the commencement of the voyage being more disconnected with the trade itself; but the conduct there afterwards, in taking known and shackled slaves on board, and carrying them from one foreign port to another, was open, reiterated, and far stronger than in the present instance. Nor am I aware of any decided case connected with these questions, where the courts of the United States have held doctrines concerning them different from those just laid down.

Take up then, gentlemen, all the circumstances in the present case, differing as well as similar to that of Battiste, and any former decisions. Look at the whole real object and character and conduct of the voyage, and then decide whether the three points are satisfactorily made out or not, which are necessary to convict under this indictment, viz.: (1) That Libby was a part of the crew or ship's company of a vessel of the United States. (2) That he received Luez on board the Porpoise about 8th of December, 1844. (3) That he did it with intent to make him

a slave. The first point seems fully proved, if the captain of a vessel be a part of the crew or ship's company. And we give you in charge that he is. The second point is made out, if you believe Libby saw Luez come on board, and assented to his being and remaining there as one of Paulo's slaves for the few hours he was on board. But if, on the contrary, in the pressure of business, and crowd of people, he did not know or notice that any black came on board in the pilot's boat, except his colored oarsmen, he did not receive him designedly. A person brought into a vessel surreptitiously, or without the knowledge or assent of the master, of course cannot be said to be received by him on board within the meaning of the law, so as to make the master punishable with death, as receiving him with a view to make him a slave. You have heard the evidence on both sides: that Luez in fact came on board in the same boat with the pilot as well as with Paulo; how the master was then busily engaged—the short time that Luez remained there—the short distance he was carried, and the want of motive Libby would have to carry Luez, and refuse to carry any others not supposed to be free, or not the crew of the pilot, such as Guilheme and Pedro, till they had, as is claimed, free papers, before he received them. You will look to all which operates both for and against him on this point, and decide as your duty seems to you to require. But the third and last point is the most important in order to constitute the capital offence. Did he intend to make Luez a slave? In order to find this against him, it is not necessary that Luez should have been free, and that Libby thus attempted to make him a slave for the first time. It is enough, if he meant to coöperate as a party in interest and power, and design, to perpetuate his condition as a slave, and received him on board for that purpose.

In conclusion, gentlemen, while on the one hand, you cannot be too anxious to vindicate your country from any imputation of connivance at the illegal traffic in slaves from the African coast, and to punish every offence, satisfactorily proved, against its laws on this subject, (this nation being first and foremost in the world to hold up such offences to condign severity of punishment,) and solicitous, as we all are, to show every people that no reasonable effort will be spared to sustain the policy of most of the present governments of Christendom to suppress that inhuman traffic; yet you will of course abide by your oaths in doing this, and convict the prisoner, only if guilty, under the laws and the evidence. And you will be happy to find in any case, if these laws and the evidence justify the conclusion, that one of your own countrymen charged with this crime, has been so true to the biddings of duty and so faithful to the laws, so observant of the honor and character of the place

of his birth and education, as not to pollute his hands with participating in the gain or the turpitude of what. in the present age, is generally regarded so ignominious no less than cruel as the trade in human blood.